## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

JAN 2 0 2021

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | | |
|---|---|---|
| KEVIN GARY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Crim No. 1:08-cr-00086-ELH-3 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, KEVIN GARY ("Gary"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Gary's health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Gary. Gary's diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Gary to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

# I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

# II. PROCEDURAL HISTORY

## A.    Procedural Background

On February 21, 2008, the United States Attorney in the District Court for the District of Maryland, Baltimore Division, returned a twenty (20) Count Indictment charging Gary and twenty-seven other co-defendants. See Doc. 1.[1] Count 1 charged

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the District of Maryland, Baltimore Division in Criminal No. 1:08-cr-00086-ELH-3, which is immediately followed by the Docket Entry Number.

Gary with Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d). *Id.* Count 2 charged Gary with Conspiracy to Distribute and Possess With Intent to Distribute Controlled Substance, in violation of 21 U.S.C. § 846. *Id.* Count 11 charged Gary with Distribution and Possession With Intent to Distribute Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *Id.*

On January 12, 2009, a Re-arraignment Hearing was held and Gary pled guilty as to Count 1 of the Indictment, pursuant to a written Plea Agreement. See Docs. 467, 468.

On March 27, 2009, Gary was sentenced to a term of 360 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Docs. 511, 513.

On March 28, 2009, Gary timely filed a Notice of Appeal. See Doc. 512.

On December 29, 2010, the United States Court of Appeals for the Forth Circuit ("Fourth Circuit") affirmed Gary's sentence and conviction. See Doc. 1138.

On September 19, 2013, Gary filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which was denied on August 17, 2016. See Doc. 1492.

**B.   Statement of the Relevant Facts**

1.   Offense Conduct

The government and Gary, through the advice of his counsel, stipulated and agreed to the following factual basis for guilty plea:

> On or about July 8, 2007, Orlando Gilyard, Shonn Eubanks, Kevin Gary, Jerrod Fenwick, Shaneka Penix, Diane Kline, Anthony Fleming, Sean Frazier and others met with one another at a 911 in Carroll Park to discuss gang activities.

> On or about August 21, 2007, in a recorded telephone call, Kevin Gary advised a male individual that he "and Wild run this sh**. F*** everybody else."

> On or about August 21,2007, in a recorded telephone call, Diane Kline Informed Kevin Gary that "they ate Don Pappa," who was a member of the Bounty Hunter Bloods, and "that y'all supposed to be on point."

> On or about August 24, 2007, in a recorded telephone call, Diane Kline complained to Kevin Gary about Sherman Pride sending Steve Willock TTP-related mail, attracting too much attention, and asked Gary to instruct Pride to cease and desist.

> On or about August 25,2007, in a recorded telephone call, Kevin Gary advised a male that he, GARY, would call TTP members in Compton, California, to confirm the male's gang membership.

> On or about October 9, 2007, Kevin Gary, Keili Dyson, Sean Frazier and Allen Smith had a 911 at which time Keili Dyson requested status greater than his OYG rank and Gary advised that "the books are closed" in terms of accepting new TTP members because the Feds are watching them.
> On or about October 30, 2007, in a recorded telephone Call, Kevin Gary advised Bandy, a Tree Top Pirette, that it is "Brittany and Felicia's job to let motherf******

know when the 911 is. I said you ain't got nothing to do with that. You keep your mouth out of it."

On or about November. 17, 2007, in a recorded telephone call, Kevin Gary and Sean Frazier complained about Allen Smith's reckless use of a telephone visa-vis his November 16, 2007, order to kill an individual over a gang dispute.

In an undated letter received by law enforcement on or about November 27,2007, Kevin Gary wrote to Steve Willock and described the trouble with the gang that "we are losing brothers like it's the fashion trend or something." Gary continued, "Me, Brock and Poe are the last of them" and advised Willock that he "run [s] this sh** with the same iron fist I been running it with."

In an undated letter received by law enforcement on or about November 28, 2007, Steve Willock wrote to Kevin Gary and explained That Ronnie Thomas is attempting to leave TTP and re-form his own neighborhood gang. In the same letter, Willock advised Gary that Orlando Gil Yard "went out west and disrespected the big homies out there for a bi*** and made us look stupid while doing it. I don't know where he is but you already know he can't go back to Compton either."

In or about December 2007, Steve Willock wrote to Kevin Gary and discussed, in coded language, the rank of a TTP member. In that same letter, Willock advised Gary not "to use that northern slang for that case you and the other gees have. That sh** is beyond hot and will get you snatched on conspiracy. Tell the homeboys not to use it for no reason. I've seen it in paperwork 4 times over the last 2 weeks. It is not a code when they [law enforcement] know. It's like English to them! Anyway, stay up and ready. Tree Gang Or Don't Bang."

On or about January 14,2008, in a series of recorded telephone calls, Kevin Gary and Ronnie Thomas criticized Steve Willock's leadership of TTP and complained about having to take orders from Willock because Willock is not from Baltimore. In speaking about Willock, Thomas stated, "He a New York boy. He was so much of a stone cold New York boy, why you ain't, what you ain't got another tree? Why you ain't got another

tree? Why didn't you set up somebody's murder or something. Nig***
ain't even been to Baltimore before." Gary responded; "Right. That's
what I'm saying. That's what I'm talk to Scar and sh** man. We, we
really don't don't for real. We got the numbers and we (inaudible) we talk
to the mother fu**ers over west every day. We got the numbers over
there. Them nig**** know us. We sent we sent people over there. I mean.
So we really don't for real. At all in no type of way. Gary continued, "I
can make, I can make the phone call today to the west and let them
nig**** know. You know what I mean cause he still, he still be writing
them. nig* *** and asking them nig**** like see. He be writing them
nig**** and asking them nig**** like what's this that and the other
(inaudible). You feel me. Where as though, he try to gain knowledge from
this four hundred shit; so, I guess he can implement it to us. But shouldn't
he be telling me. I already know cause I talk to the nig*** every day. I
talk to the, I talk to the real triple every day. I talk to Don Zeli everyday
yo. You feel me. I talk, I can talk to the nig* ***. I can, I can, I can call
the nig* *** today and tell them like look man we not fuc**** with yo no
more. Yo don't serve no purpose. Tell em all the sh** he be doing. You
feel me and that'll be it. I got all them nig**** on the phone cause we had
we had uh a pirette down here from 200 Poplar came down here from uh
from Compton and sh** and was, she (inaudible) with us for like, like a
good two weeks for real. We talked all them on the phone: Layne,
G-Wayne, Don Zeli, all the, all the, all the big dogs down in Compton.
Matter of fact, me and Wild supposed to went down and sh**, but we
didn't ever make it. But yeah man we talked them nig****, we talked
them nig**** on the phone cause shorty went back down there and told
them all we was getting done up here. You know what I mean. Them nig*
*** they know us, they know us down there. You feel me. They knows
us down there; so, nig**** don't, nig****, nig**** ain't never heard,
heard of yo before. Nig**** ain't, ain't nobody spinning no stories about
yo. Nig**** don't even know yo."

See Doc. 468 at 12-14.

### 2.    Plea Proceeding

On January 12, 2009, a Re-arraignment Hearing was held before Judge William D Quarles, Jr. See Doc. 467. Gary pled guilty to Count 1 and not guilty on Counts 2 and 11 of the Indictment, pursuant to a written Plea Agreement. See Doc. 468. In exchange for Gary's guilty plea, the government agreed to: (1) recommend a sentence of 360 months; and (2) move to dismiss any open counts against Gary at sentencing. *Id.* at 5. The case was referred to the Probation Office for the preparation of the PSR.

### 3.    Presentence Report Calculations and Recommendations

As set forth in the PSR, Gary's Base Offense Level was level 43, pursuant to USSG §§ 2D1.1(d)(1) and 2A1.1(a). Gary received a three (3) level reduction for acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) and (b). However, Gary was deemed to be acreer offender within the meaning of § 4B1.1. As a result, Gary was placed in Criminal History Category VI. Based upon a Total Offense Level of 40 and a Criminal History Category of VI, the advisory guideline range was 360 months to Life imprisonment.

### 4.    Sentencing Proceeding

On March 27, 2009, a Sentencing Hearing was held before Judge William D Quarles, Jr. See Doc. 511. At sentencing, the Court sentenced Gary to 360 months, as stipulated in the Fed. R. Crim. P. 11(c)(1)(C) provision of his Plea Agreement. See

Doc. 513. Followed by 5 years of supervised release. *Id.* at 2. The Court also ordered payment of a Mandatory Special Assessment Fee of $100. *Id.* at 5. A timely Notice of Appeal was filed on March 28, 2009. See Doc. 512.

     5.   Appellate Proceeding

On appeal, counsel have filed a joint brief (for Shaneka Penix and Kevin Gary) in accordance with *Anders v. California*, 386 U.S. 738 (1967), stating that, in their view, there are no meritorious issues for appeal. Counsel question, however, whether the district court erred in finding Penix ineligible for sentencing consideration under the safety valve provisions of 18 U.S.C. § 3553(f) (2006), and whether the district court complied with Fed. R. Crim. P. 11 in accepting Gary's guilty plea. The Government declined to file a brief and does not seek to enforce the waiver of appeal rights contained in the plea agreements. Appellants were notified of their opportunity to file *pro se* supplemental briefs but have not done so.

In accordance with *Anders*, teh Fourth Circuit reviewed the record in these cases and have found no meritorious issues for appeal. Therefore, Penix's and Gary's convictions, affirmed Penix's sentence, and dismissed Gary's appeal of his sentence. See United States v. Penix, No. 08-5117, 09-4330 (4ᵗʰ Cir. 2010).

8

## III. DISCUSSION

As a preliminary matter, Gary respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Clark v. Cartledge*, 829 F.3d 303 (4th Cir. 2016); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519 (1972) (same).

A. **Gary's Current Conditions of Confinement and Health Conditions.**

    1. Defendant, Kevin Gary, was sentenced in 2009 for Conspiracy to Participate in a Racketeering Enterprise (Count 1). This gave Gary a total term of 360 months' imprisonment.

    2. Gary, age 39, currently housed at Correctional Institution, in Fort Dix, New Jersey ("FCI Fort Dix").

    3. Gary's projected release date is on December 22, 2032. However, he suffers from incurable, progressive disease, from which Gary will never recover, to wit: Sarcoidosis, Sleep Apnea, Hypertension, Obesity, and Asthma.[2] Gary also suffers from bronchitis,

---

[2]

    *Sarcoidosis*. Sarcoidosis is an inflammatory disease in which the immune system overreacts, causing clusters of inflamed tissue called "granulomas" to form in different organs of the body. Sarcoidosis most commonly affects the lungs and lymph nodes, but it can also affect the eyes, skin, heart and nervous system. In severe cases, sarcoidosis can be life-threatening if it progresses to heart or severe lung disease. The Foundation for Sarcoidosis Research estimates that there are fewer than 200,000 cases per year in the United States. Although anyone can develop sarcoidosis, people of African and Scandinavian descent are more at risk. African-Americans are three times more likely to be diagnosed with sarcoidosis than Caucasians and tend to have more severe disease. The cause of sarcoidosis is unknown, but it seems to have both a genetic and an environmental component. When someone whose genes make them more prone to developing sarcoidosis is exposed to a trigger such as an infection or environmental contaminant, their immune system can overreact and start the development of the disease. If you work in dusty or moldy environments, you may be at a higher risk of developing sarcoidosis.

abnormalities of breathing, myopia, dermatophytosis, blepharitis, and dependent on other enabling machines and devices. See Exhibit 1.

**B.  UNDER THE FIRST STEP ACT, THIS COURT HAS BROAD AUTHORITY TO DETERMINE WHETHER EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST TO MODIFY GARY'S SENTENCE AND RELEASE HIM TO HOME CONFINEMENT.**

The First Step Act ("FSA") expressly permits Gary to move this Court to reduce

his term of imprisonment and seek compassionate release. See 18 U.S.C. §

3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through

---

*Sleep Apnea.* Sleep apnea is a condition in which your breathing repeatedly pauses while you sleep. When this happens, your body wakes you up to resume breathing. These multiple sleep interruptions prevent you from sleeping well, leaving you feeling extra tired during the day. Many health conditions are linked to sleep apnea, including obesity and high blood pressure. These conditions, coupled with the lack of sleep, can harm many different systems in your body.

*Hypertension.* Hypertension is another name for high blood pressure. It can lead to severe health complications and increase the risk of heart disease, stroke, and sometimes death. Blood pressure is the force that a person's blood exerts against the walls of their blood vessels. This pressure depends on the resistance of the blood vessels and how hard the heart has to work. Hypertension is a primary risk factor for cardiovascular disease, including stroke, heart attack, heart failure, and aneurysm. Keeping blood pressure under control is vital for preserving health and reducing the risk of these dangerous conditions.

*Obesity.* Obesity is a complex disease involving an excessive amount of body fat. Obesity isn't just a cosmetic concern. It is a medical problem that increases your risk of other diseases and health problems, such as heart disease, diabetes, high blood pressure and certain cancers. Obesity is diagnosed when your body mass index (BMI) is 30 or higher. To determine your body mass index, divide your weight in pounds by your height in inches squared and multiply by 703. Or divide your weight in kilograms by your height in meters squared.

*Asthma.* Asthma is a condition in which your airways narrow and swell and produce extra mucus. This can make breathing difficult and trigger coughing, wheezing and shortness of breath. Asthma attacks can be fatal. A severe asthma attack can prevent you from getting enough oxygen into your lungs and can even stop your breathing. Therefore, severe asthma attack requires emergency medical attention. Severe to moderate asthma is listed as a CDC high risk condition.

the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* Gary files this motion now in light of the urgent nature of this matter. See discussion, infra Part i. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (S.D.N.Y. Jan. 8, 2020), ECF No. 384. "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." See, e.g., *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's

11

amendments. *United States v. Beck*, 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019); see also *Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

## C.     The Unprecedented Nature of this Emergency Compels the Court to Find the Exhaustion Requirement Waived.

The Court need not and should not wait for Gary to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Gary. See generally *Washington v. Barr*, 925 F.3d 109, 120-21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. See *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); see also *United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of

prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. See, e.g., *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (citing *Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen*

that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); see also *Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Gary's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought either by the "Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully

14

exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through FCI).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of

the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. And the FCI Legal Department has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic. Thus, it would be futile to force defendants to exhaust their administrative

remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in the prisons. And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up.

As of December 22, 2020, we have 77,925,298 cases of COVID-19 and 1,714,649 deaths worldwide. The United States alone has 18,267,056 confirmed cases of COVID-19 and 322,839 deaths. Recently, COVID-19 vaccine has been approved but supplies are limited. The Associated Press ("AP") reported in November 2020 that documents obtained from BOP revealed that although coronavirus rates were surging in inmate populations, vaccinations would be "reserved for staff" when they are received. When explaining its vaccination process, BOP said earlier on Tuesday it planned to offer vaccines to full-time bureau staff members, saying doing so "protects the staff member, the inmates at the facility, and the community." However, BOP spokesman Justin Long told the AP, "At this time, we can confirm high risk inmates in a few of the BOP facilities in different regions of the country have received the vaccine." The AP noted that BOP has not stated how many inmates have been vaccinated or what the selection process is. It is also unclear at this time how many doses of the vaccine BOP has received. The AP also reported that 3,624 federal

inmates and 1,225 BOP staff members have tested positive for COVID-19 so far, with 171 inmate deaths due to the coronavirus.

Due to limited supplies, not everyone will be able to get a COVID-19 vaccine right away. Hence, the government and medical experts, advise that to protect yourself and help prevent spreading the virus to others, do the following:

- Wash your hands regularly for 20 seconds, with soap and water or alcohol-based hand rub;
- Cover your nose and mouth with a disposable tissue or flexed elbow when you cough or sneeze;
- Avoid close contact (1 meter or 3 feet) with people who are unwell; and
- Stay home and self-isolate from others in the household if you feel unwell.

With the speed and unpredictability of this pandemic worldwide—now U.S. is the epicenter of the pandemic—waiting even 30 days will be too late. Accordingly, this Court should exercise jurisdiction over Gary's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

Indeed, in *United States v. Wilson Perez*, 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, the Honorable Analisa Torres deemed the exhaustion requirement waived, and held that all three exceptions (futility, incapability, and prejudice) apply to the instant circumstances. See also *United States v. Latrice Colvin*, No. 19 Cr. 179 (JBA) (D. Conn. Apr. 2, 2020), ECF No. 38 (granting compassionate release and waiving exhaustion requirement); *United States v. Zukerman*, 16 Cr. 194 (AT),

18

2020WL1659880 (S.D.N.Y. Apr. 3, 2020), at *2 (same); *United States v. Powell*, 94 Cr. 316 (D.D.C. Mar. 28, 2020), ECF No. 98 (same).

### D.    "Extraordinary and Compelling Reasons" Warrant a Reduction in Gary's Sentence.

#### 1.    COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Gary.

The COVID-19 pandemic continues to roil the United States. As December 22, 2020, the BOP has 124,247 federal inmates in BOP-managed institutions and 13,831 in community-based facilities. The BOP staff complement is approximately 36,000. There are 5,929 federal inmates and 1,620 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 171 federal inmate deaths and 2 BOP staff member deaths attributed to COVID-19 disease. Specifically, FCI Fort Dix has 150 inmates and 10 BOP staff member who tested COVID-19 positive. See https://www.bop.gov/coronavirus/ (last accessed December 22, 2020). Federal facilities are not immune. The numbers are likely higher, as testing is limited. See, e.g., *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested").

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters,

there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. BOP*, (No. 19-1778) (2d Cir. Mar. 20, 2020).

20

2.   <u>Gary's Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.</u>

Gary is particularly vulnerable to COVID-19 because of his sarcoidosis, sleep apnea, hypertension, obesity, and asthma. At the time of sentencing, the Court could not have anticipated that Gary's diseases will place him in the "high risk" category nor the existence of the COVID-19. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as diabetes, heart disease, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

a.   *Lung Problems, Including Asthma*

COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

b.   *Heart Disease, Diabetes and Obesity*

People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may

be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

When people with diabetes develop a viral infection, it can be harder to treat due to fluctuations in blood glucose levels and, possibly, the presence of diabetes complications. There appear to be two reasons for this. Firstly, the immune system is compromised, making it harder to fight the virus and likely leading to a longer recovery period. Secondly, the virus may thrive in an environment of elevated blood glucose.

Moreso, obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

c,   *How SARS-COV-2 Causes Disease and Death in COVID-19*

"You'd think underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an

22

anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

Hence, it is appropriate for Gary to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a.   Based on what we know now, those at high-risk for severe illness from COVID-19 are:

- People 60 years and older
- People who live in a nursing home or long-term care facility

b.   People of all ages with underlying medical conditions, particularly if not well controlled, including:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
- Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Gary's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13

provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like FCI to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Gary suffers from ailments that have already been identified as "high risk," this Court should find that Gary's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail

and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

3.  Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No.

17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request and converting remaining sentence to home confinement); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020), ECF No. 1325-1326 (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19).

27

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19); *United States v. Coker*, No. 3:14-CR-085-RLJ-DCP-20, 2020 WL 1877800 (E.D. Tenn. Apr. 15, 2020) (Memorandum Opinion, granting compassionate release based in part on

28

COVID-19); *Samy v. United States*, No. 2:16-cr-20610-1, 2020 WL 1888842 (E.D. Mich Apr. 16, 2020) (Order granting petitioner's motion for reconsideration of order denying compassionate release based in part on COVID-19).

Here, although those factors fully support the substantial sentence originally imposed, in the current context of Gary's incurable medical condition, Gary's family believes compassionate release is appropriate at this time.

In light of the outbreak, Gary's release does not present a danger to the safety of any other person or to the community and is in keeping with all relevant § 3553(a) factors. Releasing Gary will not only protect him from the risk of COVID-19 infection but also avoids the unavoidable impact upon the quality of the medical care he requires by taxing an already taxed system.[3] Thus, compassionate relief is warranted.

Gary is a non-violent and non-sex offender, hence, his recidivism is especially low. Based on his medical condition and the world's take on the global pandemic right now, and good time credits he has served, Gary have met all the requirements for compassionate release. Further, since Gary's incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 2. Gary has verbally and physically denounced hi gang affiliation. More so, he

---

[3]

Natalie Hinton, Comment, *Curing the BOP Plague with Booker: Addressing the Inadequate Treatment in the Bureau of Prisons*, 41 J. Marshall L. Rev. 219, 231 (2007) (noting "BOP overpopulated and understaffed for years.")

has written 37 novels since his incarceration. Nine (9) out of the 37 novels are published and is available on Amazon Books under his pseudonym "KAYO." For the past eight (8) years, Gary have been teaching his peers how to write books as well. In fact, in his last two (2) institutions, he was trusted with the responsibility to educate others with the writing talent he possess. Gary holds his class every Monday at 10:00 A.M. This effort and its obvious achievements should be welcome news to this Honorable Court due to the fact that Golfius has taken continuous strides to prepare himself for reentry back into society to be a law abiding citizen.

If granted compassionate release, Gary will reside with his family– where he will be able to isolate himself and take the same precautionary measures that all Americans are taking: frequent hand washing, sanitizing his living space, and seeking medical care if necessary. None of these precautions are available in prison. Gary will receive medical care from his doctors, who are located near their home. Further information about these release plans upon request.

## IV. <u>CONCLUSION</u>

For the above and foregoing reasons, Gary prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and release him to home confinement or hold a hearing as soon as possible.

Respectfully submitted,

Dated: January 5, 2021.

*Kevin Gary*

KEVIN GARY
REG. NO. 43319-037
FCI FORT DIX
FEDERAL CORR. INSTITUTION
P.O. BOX 2000
JOINT BASE MDL, NJ  08640
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the above and foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 was sent via U. S. Mail, postage prepaid, Michael Clayton Hanlon, Assistant U.S. Attorney at U.S. Attorney's Office, 36 S Charles St. Fourth Fl., Baltimore, MD 21201.

*Kevin Gary*

KEVIN GARY