**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

MAY 2 3 2022

AT BA...
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

KEVIN GARY,                                )
                                           )
        Movant,                            )
                                           )
v.                                         )   Crim No. 1:08-cr-00086-ELH-3
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
        Respondent.                        )

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, KEVIN GARY ("Gary"), appearing *pro se,* and in support of this memorandum would show as follows:

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term

of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. PROCEDURAL HISTORY

### A.   Procedural Background

On February 21, 2008, the United States Attorney in the District Court for the District of Maryland, Baltimore Division, returned a twenty (20) Count Indictment charging Gary and twenty-seven other co-defendants. See Doc. 1.[1] Count 1 charged Gary with Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d). *Id.* Count 2 charged Gary with Conspiracy to Distribute and Possess With Intent to Distribute Controlled Substance, in violation of 21 U.S.C. § 846. *Id.* Count 11 charged Gary with Distribution and Possession With Intent to Distribute Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *Id.*

On January 12, 2009, a Re-arraignment Hearing was held and Gary pled guilty as to Count 1 of the Indictment, pursuant to a written Plea Agreement. See Docs. 467,

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the District of Maryland, Baltimore Division in Criminal No. 1:08-cr-00086-ELH-3, which is immediately followed by the Docket Entry Number.

468.

On March 27, 2009, Gary was sentenced to a term of 360 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Docs. 511, 513.

On March 28, 2009, Gary timely filed a Notice of Appeal. See Doc. 512.

On December 29, 2010, the United States Court of Appeals for the Forth Circuit ("Fourth Circuit") affirmed Gary's sentence and conviction. See Doc. 1138.

On September 19, 2013, Gary filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which was denied on August 17, 2016. See Doc. 1492.

On January 2021, Gary filed a Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018, which was granted on August 12, 2021. See Docs. 1670, 1671, 1744. Gary's sentence was reduced from 360 to 300 months' imprisonment.

**B.   <u>Statement of the Relevant Facts</u>**

1.   <u>Offense Conduct</u>

The government and Gary, through the advice of his counsel, stipulated and agreed to the following factual basis for guilty plea:

> On or about July 8, 2007, Orlando Gilyard, Shonn Eugene's , Kevin
> Gary, Jerrod Fenwick, Shaneka Penix, Diane Kline, Anthony Fleming,

3

Sean Frazier and others met with one another at a 911 in Carroll Park to discuss gang activities.

On or about August 21, 2007, in a recorded telephone call, Kevin Gary advised a male individual that he "and Wild run this sh**. F*** everybody else."

On or about August 21,2007, in a recorded telephone call, Diane Kline Informed Kevin Gary that "they ate Don Pappa," who was a member of the Bounty Hunter Bloods, and "that y'all supposed to be on point."

On or about August 24, 2007, in a recorded telephone call, Diane Kline complained to Kevin Gary about Sherman Pride sending Steve Willock TTP-related mail, attracting too much attention, and asked Gary to instruct Pride to cease and desist.

On or about August 25,2007, in a recorded telephone call, Kevin Gary advised a male that he, GARY, would call TTP members in Compton, California, to confirm the male's gang membership.

On or about October 9, 2007, Kevin Gary, Keili Dyson, Sean Frazier and Allen Smith had a 911 at which time Keili Dyson requested status greater than his OYG rank and Gary advised that "the books are closed" in terms of accepting new TTP members because the Feds are watching them.

On or about October 30, 2007, in a recorded telephone Call, Kevin Gary advised Bandy, a Tree Top Pirette, that it is "Brittany and Felicia's job to let motherf****** know when the 911 is. I said you ain't got nothing to do with that. You keep your mouth out of it."

On or about November. 17, 2007, in a recorded telephone call, Kevin Gary and Sean Frazier complained about Allen Smith's reckless use of a telephone visa-vis his November 16, 2007, order to kill an individual over a gang dispute.

In an undated letter received by law enforcement on or about November 27,2007, Kevin Gary wrote to Steve Willock and described the trouble with the gang that "we are losing brothers like it's the fashion trend or

4

something." Gary continued, "Me, Brock and Poe are the last of them" and advised Willock that he "run [s] this sh** with the same iron fist I been running it with."

In an undated letter received by law enforcement on or about November 28, 2007, Steve Willock wrote to Kevin Gary and explained That Ronnie Thomas is attempting to leave TTP and re-form his own neighborhood gang. In the same letter, Willock advised Gary that Orlando Gil Yard "went out west and disrespected the big homies out there for a bi*** and made us look stupid while doing it. I don't know where he is but you already know he can't go back to Compton either."

In or about December 2007, Steve Willock wrote to Kevin Gary and discussed, in coded language, the rank of a TTP member. In that same letter, Willock advised Gary not "to use that northern slang for that case you and the other gees have. That sh** is beyond hot and will get you snatched on conspiracy. Tell the homeboys not to use it for no reason. I've seen it in paperwork 4 times over the last 2 weeks. It is not a code when they [law enforcement] know. It's like English to them! Anyway, stay up and ready. Tree Gang Or Don't Bang."

On or about January 14,2008, in a series of recorded telephone calls, Kevin Gary and Ronnie Thomas criticized Steve Willock's leadership of TTP and complained about having to take orders from Willock because Willock is not from Baltimore. In speaking about Willock, Thomas stated, "He a New York boy. He was so much of a stone cold New York boy, why you ain't, what you ain't got another tree? Why you ain't got another tree? Why didn't you set up somebody's murder or something. Nig*** ain't even been to Baltimore before." Gary responded; "Right. That's what I'm saying. That's what I'm talk to Scar and sh** man. We, we really don't don't for real. We got the numbers and we (inaudible) we talk to the mother fu**ers over west every day. We got the numbers over there. Them nig**** know us. We sent we sent people over there. I mean. So we really don't for real. At all in no type of way. Gary continued, "I can make, I can make the phone call today to the west and let them nig**** know. You know what I mean cause he still, he still be writing them. nig* *** and asking them nig**** like see. He be writing them nig**** and asking them nig****

like what's this that and the other (inaudible). You feel me. Where as though, he try to gain knowledge from this four hundred shit; so, I guess he can implement it to us. But shouldn't he be telling me. I already know cause I talk to the nig*** every day. I talk to the, I talk to the real triple every day. I talk to Don Zeli everyday yo. You feel me. I talk, I can talk to the nig* ***. I can, I can, I can call the nig* *** today and tell them like look man we not fuc**** with yo no more. Yo don't serve no purpose. Tell em all the sh** he be doing. You feel me and that'll be it. I got all them nig**** on the phone cause we had we had uh a pirette down here from 200 Poplar came down here from uh from Compton and sh** and was, she (inaudible) with us for like, like a good two weeks for real. We talked all them on the phone: Layne, G-Wayne, Don Zeli, all the, all the, all the big dogs down in Compton. Matter of fact, me and Wild supposed to went down and sh**, but we didn't ever make it. But yeah man we talked them nig****, we talked them nig**** on the phone cause shorty went back down there and told them all we was getting done up here. You know what I mean. Them nig* *** they know us, they know us down there. You feel me. They knows us down there; so, nig**** don't, nig****, nig**** ain't never heard, heard of yo before. Nig**** ain't, ain't nobody spinning no stories about yo. Nig**** don't even know yo."

See Doc. 468 at 12-14.

2. Plea Proceeding

On January 12, 2009, a Re-arraignment Hearing was held before Judge William

D. Quarles, Jr. See Doc. 467. Gary pled guilty to Count 1 and not guilty on Counts

2 and 11 of the Indictment, pursuant to a written Plea Agreement. See Doc. 468. In

exchange for Gary's guilty plea, the government agreed to: (1) recommend a sentence

of 360 months; and (2) move to dismiss any open counts against Gary at sentencing.

Id. at 5. The case was referred to the Probation Office for the preparation of the PSR.

6

### 3.    Presentence Report Calculations and Recommendations

As set forth in the PSR, Gary's Base Offense Level was level 43, pursuant to USSG §§ 2D1.1(d)(1) and 2A1.1(a). Gary received a three (3) level reduction for acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) and (b). However, Gary was deemed to be career offender within the meaning of § 4B1.1. As a result, Gary was placed in Criminal History Category VI. Based upon a Total Offense Level of 40 and a Criminal History Category of VI, the advisory guideline range was 360 months to Life imprisonment.

### 4.    Sentencing Proceeding

On March 27, 2009, a Sentencing Hearing was held before Judge William D. Quarles, Jr. See Doc. 511. At sentencing, the Court sentenced Gary to 360 months, as stipulated in the Fed. R. Crim. P. 11(c)(1)(C) provision of his Plea Agreement. See Doc. 513. Followed by 5 years of supervised release. *Id.* at 2. The Court also ordered payment of a Mandatory Special Assessment Fee of $100. *Id.* at 5. A timely Notice of Appeal was filed on March 28, 2009. See Doc. 512.

### 5.    Appellate Proceeding

On appeal, counsel have filed a joint brief (for Shaneka Penix and Kevin Gary)

7

in accordance with *Anders v. California*, 386 U.S. 738 (1967), stating that, in their view, there are no meritorious issues for appeal. Counsel question, however, whether the district court erred in finding Penix ineligible for sentencing consideration under the safety valve provisions of 18 U.S.C. § 3553(f) (2006), and whether the district court complied with Fed. R. Crim. P. 11 in accepting Gary's guilty plea. The Government declined to file a brief and does not seek to enforce the waiver of appeal rights contained in the plea agreements. Appellants were notified of their opportunity to file *pro se* supplemental briefs but have not done so.

In accordance with *Anders*, the Fourth Circuit reviewed the record in these cases and have found no meritorious issues for appeal. Therefore, Penix's and Gary's convictions, affirmed Penix's sentence, and dismissed Gary's appeal of his sentence. See *United States v. Penix*, No. 08-5117, 09-4330 (4th Cir. 2010).

## III. <u>DISCUSSION</u>

As a preliminary matter, Gary respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Clark v. Cartledge*, 829 F.3d 303 (4th Cir. 2016); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519 (1972) (same).

**i.**   <u>**UNDER THE FIRST STEP ACT, THIS COURT HAS BROAD**</u>

## **AUTHORITY TO DETERMINE WHETHER EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST TO MODIFY GARY'S SENTENCE AND RELEASE HIM TO HOME CONFINEMENT.**

The First Step Act ("FSA") expressly permits Gary to move this Court to reduce his term of imprisonment and seek compassionate release. See 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* Gary files this motion now in light of the urgent nature of this matter. See discussion, infra Part i. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (S.D.N.Y. Jan. 8, 2020), ECF No. 384. "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy

statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." See, e.g., *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019); see also *Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

### A.     "Extraordinary and Compelling Reasons" Warrant a Reduction in Gary's Sentence.

#### 1.     Intervening Case Law

Gary was initially sentenced at an offense level of 40 and a criminal history category of VI resulting in a Guidelines range of 360 months to Life imprisonment. See U.S. SENT'G GUIDELINES MANUAL, Sentencing Table (U.S. SENT'G COMM'N 2010). However, an intervening change in law significantly impact these

Guidelines calculations. In this case, the parties agree that Gary was subject to a career offender enhancement that would no longer be applicable, reducing both his offense level and criminal history category. See *id.* § 4B1.1(b) (mandating minimum offense levels and a criminal history category of VI for persons subject to a career offender enhancement). Despite agreeing on the career offender enhancement, the parties (at least facially) would disagree on Gary's final offense level and criminal history category under present law. The Court would conclude that, if sentenced today, Gary would have a base offense level of 19, less 3-level reduction for timely acceptance of responsibility, establishing a total offense level of 16. Absent the career offender enhancement, Gary's total criminal history points of 9, would place him in Criminal History Category IV. Based upon a Total Offense Level of 16 and a Criminal History Category of IV, the guideline range for imprisonment is 33 to 41 months.

### *§ 2D1.1 - Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy*

**Fact:** Gary's Base Offense Level for a violation of 18 U.S.C. § 1962(d) is the greater of 19 or the offense level applicable to the underlying racketeering activity, pursuant to USSG § 2E1.1(a). The underlying racketeering activity in this case involved a conspiracy to distribute narcotics and murder. Accordingly, pursuant to

11

USSG §§ 2D1.1(d)(1) and 2A1. 1(a), the base offense level is 43. The PSR recommended a Base Offense Level of 43 because Gary pled guilty to racketeering conspiracy in violation of 18 U.S.C. § 1962(d). He admitted in his plea agreement that he was a member of the Tree Top Piru Bloods (TTP), and that the gang engaged in numerous types of criminal activity, including murder, drug-dealing and robbery. The RICO conspiracy overt acts includes a state murder, which Gary was acquitted of. Hence, his offense level should have not been increased to level 43.

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held that the Sixth Amendment to the Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. In *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), the Court applied *Apprendi* to the federal mandatory minimum and maximum sentencing scheme and held that because mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an element of the crime that must be submitted to the jury. *Id.* at 116, 133 S.Ct. 2151 (overruling *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) ).

Neither *Apprendi* nor *Alleyne* are retroactively applicable on collateral review.

See *United States v. Sanders*, 247 F.3d 139, 146 (4th Cir. 2001) (joining other circuits in finding that *Apprendi* does not apply retroactively to cases on collateral review); and *United States v. Stewart*, 540 Fed.Appx. 171 (4th Cir. 2013) (*per curiam*) (noting that *Alleyne* has not been made retroactively applicable to cases on collateral review). However, for a period of time after *Apprendi* was decided, including before passage of the Fair Sentencing Act in 2010, the jury ordinarily made a finding regarding the threshold penalty, but the court could and did impose statutory-minimum penalties regardless of any jury finding. That practice was authorized by *Harris*, and *Alleyne* did not overrule *Harris* until three years later, and three years after the Fair Sentencing Act was enacted. Nonetheless, Congress, when drafting the First Step Act in 2018, surely did not intend for courts to disregard the last six years of Supreme Court federal sentencing jurisprudence and this court declines to do so.

*Alleyne* made clear that in order to preserve a defendant's Sixth Amendment right to a jury trial, any fact that increases the statutory mandatory minimum sentence is an element of the crime which must be submitted to the jury. *Alleyne*, 570 U.S. at 116, 133 S.Ct. 2151. In this case, Gary pled guilty to racketeering conspiracy (RICO).

## *Career Offender Status*

When Gary was originally sentenced, he was subject to a career offender

13

enhancement under Guidelines § 4B1.1. See U.S. SENT'G GUIDELINES MANUAL§ 4B1.1 (U.S. SENTENCING COMM'N 2021) (hereinafter ("USSG")). However, to qualify for this enhancement, "the instant offense of conviction [must be] a felony that is either a crime of violence or a controlled substance offense[.]" *Id.* Since Gary's original sentencing, the Fourth Circuit has held that conspiracy under 21 U.S.C. § 846 is not a "controlled substance offense" within the meaning of USSG § 4B1.2(b). See *United States v. Norman*, 935 F.3d 232, 237-38 (4th Cir. 2019). Gary argues that the reasoning in *Norman* extends to the conclusion that a RICO conspiracy involving underlying drug offenses similarly cannot be a "controlled substance offense" under USSG § 4B1.2(b).

Specifically, the *Norman* court reaffirmed the principle that although USSG § 4B1.2 extended to certain conspiracy offenses, "'an overt act is an element of the generic definition of 'conspiracy' as incorporated into § 4B1.2." *Id.* at 237 (quoting *United States v. McCollum*, 885 F.3d 300, 308 (4th Cir. 2018)). In contrast, "'conspiracy' under§ 846 does not require an overt act." *Id.* at 238 (citing *United States v. Shabani*, 513 U.S. 10, 11 (1994)). Thus the Fourth Circuit concluded that "a 'conspiracy' conviction under § 846 is a categorical mismatch to the generic crime of conspiracy enumerated in § 4B1.2(b)" and could not be the subject of a career offender enhancement. *Id.* at 239.

14

Like § 842, "the RICO conspiracy statute contains 'no requirement of some overt act or specific act.'" *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) (quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997)): Thus, as with § 842, RICO conspiracy cannot qualify as a "controlled substance offense" under USSG § 4B1.2 and cannot, therefore, be the type of "instant offense of conviction" that qualifies for a career offender enhancement under the Guidelines. See USSG § 4B1.1(a) ("A defendant is a career offender if [inter alia] ... the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense."); see also *United States v. Lisbon*, 276 F. Supp. 3d 456, 459 (D. Md. 2017) (holding based on similar reasoning that "Lisbon's conviction for RICO conspiracy does not constitute a 'controlled substance offense' subject to enhancement under the career offender provision.").

### 2.    Section 3553(a) Factors

In addition to intervening law, the Court must also reassess the § 3553(a) factors in determining the propriety and extent of a sentence reduction under Section 404. See *Lancaster*, 997 F.3d at 175. Of course, one of these factors is "the sentencing range established for [] the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A). The Court should also find that two significant, and crosscutting,

factors weigh heavily in its § 3553(a) analysis: the nature and circumstances of the offense and Gary's rehabilitation.

### *Nature and Circumstances of the Offense*

Predominating in the Court's analysis is the seriousness of the conduct underlying Gary's offense of conviction. This conduct is implicated by several § 3553(a) factors, including "the nature and circumstances of the offense[;]" "the need for the sentence imposed to reflect the seriousness of the offense ... and to provide just punishment[;]" as well as the need to "afford adequate deterrence of criminal conduct." See 18 U.S.C. § 3553(a)(l), (2)(A), (2)(B).

As discussed, Gary's offense of conviction involved the trafficking of quantities of cocaine base, heroin, and ecstasy. Gary compounded the harm of this trafficking by engaging in repeated violence against his community, admitting in his Plea Agreement that he "TTP members communicated on a regular basis, among other things, to discuss and report on business related to the gang, including, among other things, past acts of violence and other crimes committed by gang members against rival gang members and others, police interactions with gang members, the identification of members who might be cooperating with law enforcement authorities and proposed actions to be taken against those individuals, and the disciplining of TTP gang members; to discuss acts of violence committed by their members with the

16

goal of inciting and encouraging further violence; to plan and agree upon the commission of future crimes, including murders, robberies, drug trafficking, and assaults, and the means to cover up these crimes; and to reinforce gang rules. Doc. 468 at 12. No. But again, these case involved conspiracy, which dealt with plan and agreements with co-conspirators– not submitted to a grand jury and definitely not proved beyond a reasonable doubt.

### *Rehabilitation*

Since Gary's incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 1. Gary has verbally and physically denounced hi gang affiliation. More so, he has written forty (40) novels since his incarceration. Eighteen (18) out of the 40 novels are published and is available on Amazon Books under his pseudonym "KAYO." For the past ten (10) years, Gary have been teaching his peers how to write books as well. In fact, in his last two (2) institutions, he was trusted with the responsibility to educate others with the writing talent he possess. Gary holds his class every Monday at 10:00 A.M. This effort and its obvious achievements should be welcome news to this Honorable Court due to the fact that Gary has taken continuous strides to prepare himself for reentry back into society to be a law abiding citizen.

This substantial evidence of rehabilitation should convince the Court that "the history and characteristics of the defendant" counsels against the sentence militated for by "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Various other related sentencing factors such as "the need for the sentence imposed ... to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training" similarly favor a lower sentence based on Gary's rehabilitation.

### *Sentencing Disparities with Co-defendants*

The last major factor that Gary highlights is the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3583(a)(6). He notes that several of his co-defendants have received sentences substantially lower than what he received; and some co-defendants received post-conviction sentencing reductions that leave Gary's present sentence as an outlier among putatively comparable co-defendants. See the table below:

| Case No. | Co-Defendant | Length of Sentence |
|----------|--------------|--------------------|
| 1:08-cr-00086-ELH-1 | Willock, Steve | - sentenced to 300 months |
| 1:08-cr-00086-ELH-2 | Fenwick, Jerrod | - sentenced to 210 months<br>- reduced to 188 months |

| | | |
|---|---|---|
| 1:08-cr-00086-ELH-3 | Gary, Kevin | - sentenced to ~~Life~~ 360<br>- reduced to 360 months |
| 1:08-cr-00086-ELH-4 | Eubanks, Shonn | - sentenced to 188 months |
| 1:08-cr-00086-ELH-5 | Sneed, Van | - sentenced to 210 months |
| 1:08-cr-00086-ELH-6 | Smith, Troy | - sentenced to 192 months |
| 1:08-cr-00086-ELH-7 | Thomas, Ronnie | - sentenced to 204 months |
| 1:08-cr-00086-ELH-8 | Frazier, Sean | - sentenced to 135 months |
| 1:08-cr-00086-ELH-9 | Smith, Allen | - sentenced to 151 months |
| 1:08-cr-00086-ELH-10 | Gilyard, Orlando | - sentenced to 75 months |
| 1:08-cr-00086-ELH-11 | Pride, Sherman | - sentenced to 262 months<br>* died in USP Beaumont |
| 1:08-cr-00086-ELH-12 | Whiting, Tracey | - sentenced to 21 months |
| 1:08-cr-00086-ELH-13 | Penix, Shaneka | - sentenced to 120 months |
| 1:08-cr-00086-ELH-14 | Kline, Diane | - released in 2008 |
| 1:08-cr-00086-ELH-15 | Brockington, Sherry | - sentenced to 57 months |
| 1:08-cr-00086-ELH-16 | Hebron, Michelle | - sentenced to 360 months |
| 1:08-cr-00086-ELH-17 | Fleming, Anthony | - sentenced to Life<br>- reduced to 360 months |
| 1:08-cr-00086-ELH-18 | Burch, Tat | - sentenced to 120 months |
| 1:08-cr-00086-ELH-19 | Dyson, Keili | - sentenced to 105 months |
| 1:08-cr-00086-CCB-20 | Jones, Naeem | - sentenced to 188 months<br>- reduced to 151 months |
| 1:08-cr-00086-ELH-21 | Gross, Antwoine | - sentenced to 151 months |
| 1:08-cr-00086-ELH-22 | Howard, Tavon | - sentenced to 84 months |
| 1:08-cr-00086-ELH-23 | Millner, Clyde | - sentenced to 240 months |

| 1:08-cr-00086-ELH-24 | Mouzone, Tavon | - sentenced to 240 months |
| 1:08-cr-00086-ELH-25 | Smith, Antonio | - sentenced to 180 months<br>- reduced to time served |
| 1:08-cr-00086-ELH-27 | Fitzgerald, Emmanuel | - sentenced to 3 years probation |
| 1:08-cr-00086-ELH-28 | Williams, Keon | - sentenced to 108 months |

**Fact:** Out of all 28 Defendants, only 5 remain in prison. If other co-defendants who were released are not deemed threat to society, so is Gary. They were all involved in the same RICO conspiracy, hence, Gary is no different than any of his co-defendants. Thus, Gary should receive the same leniency and deserve a sentence reduction to time served. Further, Troy Smith and Clyde Millner were also charged with the same state murder as Gary, but neither of them was enhanced for the state murder as Gary was. Because Gary was the only defendant enhanced for the murder, he received a 360-month sentence as opposed to the 192 months received by Smith and 240 months received by Millner.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States*

*v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556; *Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly account for unwarranted disparities between codefendants who are similarly situated, and...the district court may compare defendants when deciding a sentence."); *United*

21

*States v. Zavala*, 300 F. App'x 792, 795 (11ᵗʰ Cir. 2008) ("It is not erroneous for the district court to have considered the 'unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' when the statute specifically mandates such consideration."); *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

It is essential to also note that since Gary's incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." This effort and its obvious achievements should be welcome news to this Honorable Court due to the fact that Gary has taken continuous strides to prepare himself for re-entry back into society to be a law abiding citizen.

Given the length Gary's imprisonment, intervening laws, his personal rehabilitation, and deeply felt remorse, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued harsh detention.

Additionally, Gary also contends that evidence of his post-sentencing rehabilitation warrants a reduction. Gary's sentence would result in unwarranted sentencing disparities among similarly situated defendants. More so, his BOP record

does not show that he is violent or a threat to public safety.

Accordingly, this motion should be granted.

## IV. <u>CONCLUSION</u>

For the above and foregoing reasons, Gary prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and release him to home confinement or hold a hearing as soon as possible.

Respectfully submitted,

Dated: May 17, 2022

KEVIN GARY
REG. NO. 43319-037
FCI FORT DIX
FEDERAL CORR. INSTITUTION
P.O. BOX 2000
JOINT BASE MDL, NJ  08640
Appearing *Pro Se*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2022, a true and correct copy of the above and

foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 was sent via U. S. Mail, postage prepaid, Michael Clayton Hanlon, Assistant U.S. Attorney at U.S. Attorney's Office, 36 S Charles St. Fourth Fl., Baltimore, MD 21201.


KEVIN GARY

24