**U.S. Department of Justice**

United States Attorney
District of Maryland
Northern Division

---

*Rod J. Rosenstein*
*United States Attorney*

*Jason M. Weinstein*
*Chief, Violent Crime*

36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201

*DIRECT: 410-209-4859*
*MAIN: 410-209-4800*
*FAX: 410-962-3124*
*TTY/TDD: 410-962-4462*
*Jason.Weinstein2@usdoj.gov*

December 31, 2008

Christopher Davis, Esq.
Davis & Davis
514 10th St., NW
Ninth Floor
Washington, DC 20004

JAN - 9 2009

Re:   United States v. Kevin Gary
      Crim. No. WDQ-08-086

Dear Mr. Davis:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by January 9, 2009, it will be deemed withdrawn. The terms of the agreement are as follows:

## PRELIMINARY UNDERSTANDING THAT THIS PLEA AGREEMENT IS RENDERED NULL AND VOID UPON A DECISION BY THE ATTORNEY GENERAL TO FILE NOTICE TO SEEK THE DEATH PENALTY AGAINST THE DEFENDANT

The parties understand and agree that enforcement of this plea agreement is conditioned upon the Attorney General's authorization for the United States Attorney NOT to seek the death penalty against the Defendant. The parties understand that such authorization – if granted – will occur subsequent to the execution of this agreement, after the Attorney General's Review Committee on Capital Cases has considered the case and the Attorney General has made the final decision whether the Government should file a capital charge and a notice of intent to seek the death penalty (*see* 18 U.S.C. § 3593) against the Defendant, as set forth in the United States Attorney's Manual § 9-10.000, *et seq*. The parties agree that the terms of the plea agreement will be rendered *null, void and unenforceable* if the Attorney General authorizes the United States Attorney for the District of Maryland to file a notice of intent to seek the death penalty against the Defendant. In the event of the filing of notice to seek the death penalty, a guilty plea entered by the Defendant pursuant to this agreement will be deemed by the Defendant and this Office to be withdrawn.



Christopher Davis, Esq.
December 31, 2008
Page 2

**ACKNOWLEDGMENT THAT THE DEFENDANT UNDERSTANDS THAT THIS PLEA AGREEMENT IS VOID IF THE DEATH PENALTY IS SOUGHT BY THE GOVERNMENT.**

*Kevin Wayne Gary*
Kevin Gary, Defendant

Offense of Conviction

1. The Defendant agrees to plead guilty to Count One of the Indictment now pending against him, charging him with conspiracy to conduct and participate in the activities of a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

Elements of the Offense

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which the Government would prove if the case went to trial are as follows:

First, that the criminal enterprise set out in the Indictment existed;

Second, that the enterprise affected interstate or foreign commerce;
Third, that the Defendant was associated with or employed by the enterprise;

Fourth, that the enterprise engaged in a pattern of racketeering activity; and

Fifth, that the Defendant unlawfully, willfully and knowingly conspired with two or more persons to conduct and participate in the affairs of that enterprise through that pattern of racketeering activity.

Penalties

3. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is life imprisonment, a fine of $250,000 and a period of supervised release not to exceed five years. In addition, the Defendant must pay $100.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663,

Christopher Davis, Esq.
December 31, 2008
Page 3

3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

<u>Waiver of Rights</u>

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

Christopher Davis, Esq.
December 31, 2008
Page 4

see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

    g.  If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

<u>Advisory Sentencing Guidelines Apply</u>

    5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

    6.  This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

    a.  The base offense level for a violation of 18 U.S.C. § 1962(d) is the greater of 19 or the offense level applicable to the underlying racketeering activity, pursuant to U.S.S.G. § 2E1.1(a). The underlying racketeering activity in this case involved a conspiracy to distribute narcotics and murder. Accordingly, pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1(a), the base offense level is 43.

    b.  This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion

Christopher Davis, Esq.
December 31, 2008
Page 5

pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. Based on the foregoing, the final offense level would be 40.

7. The parties stipulate and agree that the Defendant is a career offender, pursuant to U.S.S.G. § 4B1.1. As a result, the Defendant is in Criminal History Category VI. An offense level of 40 and a Criminal History Category of VI yield an advisory guideline range of 360 months-life imprisonment.

8. This Office and the Defendant agree that with respect to the calculation of criminal history, the calculation of the advisory guidelines range, and application of the 18 U.S.C. § 3553(a) factors, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or in 18 U.S.C. § 3553(a) will be raised or are in dispute.

### Rule 11(c) (1) (C) Plea

9. The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of 360 months (30 years) is the appropriate disposition of this case. This agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of supervised release. In the event that the Court rejects this plea agreement, *either* party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

### Obligations of the United States Attorney's Office

10. At the time of sentencing, this Office will recommend a sentence of 360 months (30 years). At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

11. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment that this Office has agreed to dismiss at sentencing.

Christopher Davis, Esq.
December 31, 2008
Page 6

### Waiver of Appeal

12.  The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed, including any fine, term of supervised release, or order of restitution and any issues that relate to the establishment of the advisory guidelines range, as follows: the Defendant waives any right to appeal from any sentence of 360 months or less, and this Office waives any right to appeal from any sentence of 360 months or more. Nothing in this agreement shall be construed to prevent either the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), and appealing from any decision thereunder, should a sentence be imposed that is illegal or that exceeds the statutory maximum allowed under the law or that is less than any applicable statutory mandatory minimum provision. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

13.  The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Entire Agreement

14.  This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

Christopher Davis, Esq.
December 31, 2008
Page 7

    If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

                                Very truly yours,

                                Rod J. Rosenstein
                                United States Attorney

By: _____
                                Christopher M. Mason
                                Special Assistant United States Attorney

                                Jason M. Weinstein
                                Assistant United States Attorney

    I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_1-9-09_                                _Kevin Wayne Gary_
Date                                      Kevin Gary

    I am Kevin Gary's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_1-9-09_                                  _Christopher M Davis_
Date                                      Christopher Davis, Esq.

# ATTACHMENT A

## STIPULATED FACTS

*The undersigned parties hereby stipulate and agree that if this case had proceeded to trial, the Government would have proved the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the facts that would have been proven had this matter proceeded to trial.*

In the early 1970s, a street gang that went by the name of "the Bloods" was formed in Los Angeles, California. As time passed, the Bloods spread to areas surrounding Los Angeles and other locations, and broke into individual units or "sets," each identified or affiliated with a certain street, neighborhood, or area.

One such Bloods set based in Compton, California was called Piru Bloods. The name is derived from Piru Street, which is located in Compton, California. Within the Piru Bloods, a subset emerged known as Tree Top Pirus (TTP). The name derived from a group of streets in Compton named after trees.

TTP spread throughout other states across the country, including Maryland.

TTP in Maryland has its roots in a local gang called Trey 8, which began in the Washington County Detention Center in Hagerstown, Maryland, in or about 1999. Trey 8 was formed as a response to the aggression of better-organized inmates from Baltimore and was originally envisioned by the founders to be for mutual protection.

In 2000, Trey 8 changed its name to Insane Red Devils/Tree Top Piru (IRD/TTP). From 2000-2003, IRD/TTP spread throughout Maryland, mostly as a result of recruitment from inside of Maryland prisons. During this time, Steve Willock assumed a leadership role over IRD/TTP and directed operations from prison.

In 2005, IRD/TTP began to make contact with TTP members from California, and the latter ultimately sponsored the IRD/TTP set, which changed its name to TTP and adopted many of the rules and protocols of TTP, incorporating them into its existing practices.

Over time, a group of female gang members formed a subset of TTP. This subset was known as Tree Top Pirettes.

TTP has followed and continues to follow many of the same practices as the Bloods on the West Coast, including the following:

- an identification with the color red, which appears prominently in clothing, hats and bandanas and contact lenses worn by Bloods members on both the east and west coasts;

- a long-term and often lethal rivalry with the Crips gang, whose signature color is blue; and

- a hierarchical structure.

It was common for members of TTP to learn about the history of the Bloods. For example, Steve Willock, as a leader of TTP, distributed written materials from jail to members of TTP about the history of the Bloods.

TTP members often use a system of verbal codes to communicate with each other and to signify their association with the Bloods or a set of the Bloods. Examples include the following:

- "crab" is a derogatory term for a member of the rival Crips gang;

- The letter "c" is often replaced with the letter "b" to represent TTP members' disdain for the rival Crips gang;

- "550" refers to a civilian, that is someone who is neither a Bloods nor a rival gang member;

- "999" or "Triple 9" refers to cooperating with law enforcement;

- "Platinum" refers to a firearm;

- "Baby love" is a reference to money;

- a "10-20" or an "SP" is a superior or a sponsor in the TTP organization;

- a "pup" or "peanut" is a pledge;

- a "Big Homey" is a leader;

- a "911" is a TTP meeting;

- a "stack" is a reference to $1000.00;

- if a person is "on the menu" or "labeled food," that person has been designated as someone who is going to be "eaten," meaning seriously beaten or killed;

- "roscoes" is a term for police;

2

- to "peter roll" means to kill or assault;

- to "twirl" means to talk;

- "on point" means to be prepared for retaliation;

- "red" means "right" or "understood";

- a "mission" is a violent act;

- a "birthday boy" is a person who is to be robbed; and

- an "036" is a female Bloods member.

TTP also created and maintained a hierarchical membership structure from senior rank to junior rank. For example:

- OOOG  (Original Gangster x 3)

- OOG  (Original Gangster x 2)

- OG    (Original Gangster)

- OYG (Original Young Gangster)

In order to join TTP, potential members were required to complete an initiation process. This process sometimes involved "missions" which referred to violent acts such as robberies, assaults, or carjackings. The initiation process also involved being "jumped in to" or "blessed in to" the gang. When a potential member was jumped in, other members of TTP would beat the new member for an undetermined period of time.

Members of TTP from time to time signified their membership by wearing or "flagging" gang colors. The gang colors of TTP were burgundy. TTP members referred to one another by their gang names and often did not know fellow gang members except by their gang names.

### The Racketeering Enterprise

TTP, including its leadership, members and associates, constituted an "enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a

3

continuing unit for the common purpose of achieving the objectives of the enterprise.

## Purposes of the Enterprise

The purposes of the enterprise included the following:

- Preserving and protecting the power, territory and profits of the enterprise through the use of intimidation, armed robberies, violence, including assaults and murder, and threats of violence, and narcotics trafficking;

- Promoting and enhancing the enterprise and its members' and associates' activities, both in and out of prison through the use of intimidation, violence, including assaults and murder, and threats of violence, and narcotics trafficking;

- Keeping victims and potential victims in fear of the enterprise and in fear of its members and associates, through violence and threats of violence;

- Providing financial support and information to gang members, including those who were incarcerated for committing acts of violence or other offenses; and

- Providing assistance to other gang members who committed crimes for and on behalf of the gang in order to hinder, obstruct and prevent law enforcement officers from identifying the offender, apprehending the offender and trying and punishing the offender.

The Defendant, **KEVIN GARY**, a member and leader of the TTP Bloods, together with others, did knowingly conspire to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Sections 1961(1) and (5) of Title 18, United States Code. The Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## Acts in Furtherance of the Enterprise

### Gang Activities – Generally

      1.    TTP members communicated on a regular basis, among other things, to discuss and report on business related to the gang, including, among other things, past acts of violence and other crimes committed by gang members against rival gang members and others, police interactions with gang members, the identification of members who might be cooperating with law enforcement authorities and proposed actions to be taken against those individuals, and the disciplining of TTP gang members; to discuss acts of violence committed by their members with the goal of inciting and encouraging further violence; to plan and agree upon the commission of future crimes, including murders, robberies, drug trafficking, and assaults, and the means to cover up these crimes; and to reinforce gang rules. This type of meeting was called a "911." The following are examples of gang-related communications involving **GARY**:

      a.    On or about July 8, 2007, **ORLANDO GILYARD, SHONN EUBANKS, KEVIN GARY, JERROD FENWICK, SHANEKA PENIX, DIANE KLINE, ANTHONY FLEMING, SEAN FRAZIER** and others met with one another at a 911 in Carroll Park to discuss gang activities.

      b.    On or about August 21, 2007, in a recorded telephone call, **KEVIN GARY** advised a male individual that he "and Wild run this sh\*\*. F\*\*\* everybody else."

      c.    On or about August 21, 2007, in a recorded telephone call, **DIANE KLINE** informed **KEVIN GARY** that "they ate Don Pappa," who was a member of the Bounty Hunter Bloods, and "that y'all supposed to be on point."

      d.    On or about August 24, 2007, in a recorded telephone call, **DIANE KLINE** complained to **KEVIN GARY** about **SHERMAN PRIDE** sending **STEVE WILLOCK** TTP-related mail, attracting too much attention, and asked **GARY** to instruct **PRIDE** to cease and desist.

      e.    On or about August 25, 2007, in a recorded telephone call, **KEVIN GARY** advised a male that he, **GARY**, would call TTP members in Compton, California, to confirm the male's gang membership.

      f.    On or about October 9, 2007, **KEVIN GARY, KEILI DYSON, SEAN FRAZIER** and **ALLEN SMITH** had a 911 at which time **KEILI DYSON** requested status greater than his OYG rank and **GARY** advised that "the books are closed" in terms of accepting new TTP members because the Feds are watching them.

      g.    On or about October 30, 2007, in a recorded telephone call, **KEVIN GARY** advised Bandy, a Tree Top Pirette, that it is "Brittany and Felicia's job to let motherf\*\*\*\*\*\*

know when the 911 is. I said you ain't got nothing to do with that. You keep your mouth out of it."

   h. On or about November 17, 2007, in a recorded telephone call, **KEVIN GARY** and **SEAN FRAZIER** complained about **ALLEN SMITH's** reckless use of a telephone vis-à-vis his November 16, 2007, order to kill an individual over a gang dispute.

   i. In an undated letter received by law enforcement on or about November 27, 2007, **KEVIN GARY** wrote to **STEVE WILLOCK** and described the trouble with the gang that "we are losing brothers like it's the fashion trend or something." **GARY** continued, "Me, Brock and Poe are the last of them" and advised **WILLOCK** that he "run[s] this sh** with the same iron fist I been running it with."

   j. In an undated letter received by law enforcement on or about November 28, 2007, **STEVE WILLOCK** wrote to **KEVIN GARY** and explained that **RONNIE THOMAS** is attempting to leave TTP and re-form his own neighborhood gang. In the same letter, **WILLOCK** advised **GARY** that **ORLANDO GILYARD** "went out west and disrespected the big homies out there for a bi*** and made us look stupid while doing it. I don't know where he is but you already know he can't go back to Compton either."

   k. In or about December 2007, **STEVE WILLOCK** wrote to **KEVIN GARY** and discussed, in coded language, the rank of a TTP member. In that same letter, **WILLOCK** advised **GARY** not "to use that northern slang for that case you and the other gees have. That sh** is beyond hot and will get you snatched on conspiracy. Tell the homeboys not to use it for no reason. I've seen it in paperwork 4 times over the last 2 weeks. It is not a code when they [law enforcement] know. It's like English to them! Anyway, stay up and ready. Tree Gang Or Don't Bang."

   l. On or about January 14, 2008, in a series of recorded telephone calls, **KEVIN GARY** and **RONNIE THOMAS** criticized **STEVE WILLOCK's** leadership of TTP and complained about having to take orders from **WILLOCK** because **WILLOCK** is not from Baltimore. In speaking about Willock, **THOMAS** stated, "He a New York boy. He was so much of a stone cold New York boy, why you ain't, what you ain't got another tree? Why you ain't got another tree? Why didn't you set up somebody's murder or something. Nig*** ain't even been to Baltimore before." **GARY** responded, "Right. That's what I'm saying. That's what I'm talk to Scar and sh** man. We, we really don't don't for real. We got the numbers and we (inaudible) we talk to the mother fu**ers over west every day. We got the numbers over there. Them nig**** know us. We sent we sent people over there. I mean. So we really don't for real. At all in no type of way. **GARY** continued, "I can make, I can make the phone call today to the west and let them nig**** know. You know what I mean cause he still, he still be writing them nig**** and asking them nig**** like see. He be writing them nig**** and asking them nig**** like what's this that and the other (inaudible). You feel me. Where as though, he try to gain knowledge from this four hundred shit; so, I guess he can implement it to us. But shouldn't he be telling me. I already know cause I talk to the nig*** every day. I talk to the, I talk to the real triple every day. I talk to Don Zeli every

6

day yo. You feel me. I talk, I can talk to the nig****. I can, I can, I can call the nig**** today and tell them like look man we not fuc**** with yo no more. Yo don't serve no purpose. Tell em all the sh** he be doing. You feel me and that'll be it. I got all them nig**** on the phone cause we had we had uh a pirette down here from 200 Poplar came down here from uh from Compton and sh** and was, she (inaudible) with us for like, like a good two weeks for real. We talked all them on the phone: Layne, G-Wayne, Don Zeli, all the, all the, all the big dogs down in Compton. Matter of fact, me and Wild supposed to went down and sh**, but we didn't ever make it. But yeah man we talked them nig****, we talked them nig**** on the phone cause shorty went back down there and told them all we was getting done up here. You know what I mean. Them nig**** they know us, they know us down there. You feel me. They knows us down there; so, nig**** don't, nig****, nig**** ain't never heard, heard of yo before. Nig**** ain't, ain't nobody spinning no stories about yo. Nig**** don't even know yo."

### Drug-Trafficking

      2.    During the period charged in the Indictment, **KEVIN GARY** and other TTP members participated in a conspiracy to distribute and possess with intent to distribute controlled substances. It was reasonably foreseeable to **GARY** that the conspiracy involved the distribution of 50 grams or more of crack cocaine and one kilogram or more of heroin, as well as 3,4-methylenedioxymethamphetamine (MDMA), commonly known as Ecstasy. **GARY** committed the following acts, among others, in furtherance of the distribution of controlled substances by TTP:

      a.    On or about August 6, 2007, **KEVIN GARY** and **JERROD FENWICK** sold one ounce of heroin.

      b.    On or about October 2, 2007, **KEVIN GARY** collected drug proceeds from **TAVON HOWARD**, who had sold **JERROD FENWICK's** drugs after **FENWICK's** arrest.

      c.    On or about February 14, 2008, in a series of recorded telephone calls beginning at approximately 3:35 pm, **SHANEKA PENIX** told **KEVIN GARY** that "the white boys just hit my phone." **PENIX** then asked for **SEAN FRAZIER's** telephone number and explained to **GARY** that "I got something big for him and I need him to do it. These calls were in reference to arranging a sale of crack cocaine by **PENIX**.

### Sanctions/Acts of Violence/Firearms

      3.    TTP members and associates of TTP purchased, maintained and circulated a collection of firearms for use in criminal activity by TTP members. The following are examples of acts by **GARY** in connection with TTP's maintenance and use of firearms:

7

   a.   On or about August 25, 2007, in a recorded telephone call which referenced an argument between TTP members and non-gang members, **KEVIN GARY** ordered TTP members to "go ahead and grab your guns."

   b.   On or about August 31, 2007, in a recorded telephone call, **SHERRY BROCKINGTON** asked **KEVIN GARY** for a firearm. **GARY** advised that he would obtain one for her.

   c.   On or about February 16, 2008, in a recorded telephone call, KEVIN GARY asked an unknown female if she still had "that platinum chain" she used to carry in her purse because something "might transpire" later that day that would require him to have "that platinum chain." The unknown female said she didn't have it anymore but could get another one. "Platinum chain" was a coded reference to a firearm.

4.   Members of TTP frequently engaged in acts of violence including, but not limited to, murders, assaults, robberies, kidnappings, and threatening and intimidating of witnesses. TTP members were required to commit acts of violence to maintain membership and discipline within the gang and against rival gangs. Participation in criminal activity by a member, particularly violent acts directed at rival gangs or as directed by the gang leadership, increased the respect accorded to that member, resulted in that member maintaining or increasing his position in the gang, and could have resulted in a promotion to a leadership position. For example:

   a.   On or about September 20, 2005, between the hours of 11:00 p.m. and midnight, Terrance Williams was beaten and murdered by TTP members in a gang-related dispute. **CLYDE MILLER** slit Williams' throat, and Williams was then kicked and beaten by other TTP members, including **KEVIN GARY**.

   b.   On or about August 27, 2007, in a recorded telephone call, a TTP member sought advice from **KEVIN GARY** as to how to handle "a Homey in violation of the Constitution. . . . Every violation you can think of, he doing it."

   c.   On or about August 27, 2007, in a recorded telephone call, a TTP member advised **KEVIN GARY** that they were "keeping it gangster" and further informed **GARY** about "a mission" a day earlier in which TTP members had assaulted a Muslim

   d.   On or about August 29, 2007, in a recorded telephone call, an unknown male offered **KEVIN GARY** the opportunity to rob an individual known to have a large amount of money on his person, by informing **GARY** that "when you dust him off, you just go in his pockets and take his cheese . . . about 17-1800."

   e.   On or about August 31, 2007, at 10:16 pm, in a recorded telephone call, **KEVIN GARY** directed an unknown male to "smack" a female and "kick her in her a\*\*, yo, and tell her to stop telling people that she under me yo before I come down there and just make her

8

a memory real quick. That bi*** ain't even a Homey, G." **GARY** further said to "throw that bi*** in the street or something."

    f.  On or about August 31, 2007, at 10:26 pm, in a recorded telephone call, an unknown male advised **KEVIN GARY** that "one of my Home Girls most definitely just took care of her a**." **GARY** responded, "Red."

    g.  On or about November 10, 2007, in a recorded telephone call, an unknown male advised **KEVIN GARY** about an argument that TTP members were having with Black Guerilla Family gang members and that "J wanted me to call you and get the green light so we can eat these nig*** for real." Rather than discuss it on the phone, **GARY** wanted to meet with the male in person and directed him to "holler at me on the close up, yo."

    h.  On or about November 15, 2007, in a recorded telephone call, **KEVIN GARY,** in response to an internal gang dispute, ordered a TTP member to "sanction [another TTP member's] a**, just beat him, though."

    i.  On or about December 29, 2007, in a series of recorded telephone calls, **KEVIN GARY** berated Bandy, at that time a former Tree Top Pirette, for calling a 911 and thereafter contacted a current Tree Top Pirette, directing her "to beat someone up." **GARY** identified the target victim as Bandy and continued, "just beat that bi*** up real bad, poke her a** or something. . . . she a 550 [now]."

    j.  In or about February 2008, in a series of recorded telephone calls, **KEVIN GARY** contacted incarcerated TTP members and sought to have one of them murder "Marty," an inmate with the Maryland Department of Corrections, who **GARY** believed killed his brother. During these calls, **GARY** demanded an explanation from another TTP member as to why **GARY's** order to kill "Marty" had not been carried out when he had given the order 2 ½ months ago. **GARY** asked the TTP member, "I got to make myself get locked up to come over there and do this sh** my mother fu**ing self? I am going to make it my business because I am Piru. If I got to do it in front of the mother fu**ing warden it's going to get done." **GARY** then asked if the incarcerated TTP member knew Marty's "cell buddy." **GARY** stated, "I'd press upon his cell buddy to do it. [I'd tell him], 'Take care of this or you're gonna get done.'"

    k.  On or about February 15, 2008, in a series of recorded telephone calls, **KEVIN GARY** asked, among others, **SEAN FRAZIER** and **KEON WILLIAMS** to rob non-gang members who appeared to be selling drugs in TTP territory without TTP permission. During one phone call, Gary asked an unknown male who was to perform the robbery if he saw the two males selling drugs in TTP territory. The unknown male stated, "Said yea! I seen him. We're about to get shit handled right now. Just let me know score?" In another call, the unknown male stated to Gary, "All right I'm about to go get the hack and shit and get some platinum." In a subsequent call, Gary, sounding impatient that the robbery had not been committed yet, informed the unknown male that the "coast was clear" and that "everything can go." The unknown male asked Gary if he could get

9

a "real quick platinum down [here.]" Gary responded that he did not have any platinums and agreed with the unknown male that they should try and "strong arm" the individuals. Gary stated that he needed "the dough" and that it was "Friday too." This is a reference to the fact that drug dealers will often have more cash on hand from drug sales on Friday because it is pay day for many people.

**Obstruction of Justice**

5. TTP members and associates of TTP concealed their criminal activities and obstruct justice, including by threatening witnesses. For example:

a. On or about November 20, 2007, in a series of recorded telephone calls, **KEVIN GARY** advised an unknown female to contact **JERROD FENWICK's** attorney and advise him that D.M., who had previously pled guilty to the September 21, 2007, offenses, would testify on behalf of **JERROD FENWICK**, who was then pending trial, because there "ain't no reason for everybody to go down for this one charge."

b. On or about December 19, 2007, in a recorded telephone call with a TTP member, **KEVIN GARY**, based on paperwork provided to him by **ANTWOINE GROSS**, identified an individual he believed was cooperating with law enforcement officials in the December 2006 murder case against **TROY SMITH** and **TAVON MOUZONE**.

c. In a letter written on or about November 20, 2006, while incarcerated with **CLYDE MILLER** pending trial in state court for the murder of Terrance Williams, **KEVIN GARY** wrote to **TRACEY WHITING** and directed her to take steps to prevent "Alicia Keys" from "singing" – a reference to preventing the eyewitnesses, who were females, from testifying against **GARY** and **MILLER** at the state court trial. In the letter, Gary wrote, "I do want Alicia [Keys] to feel uncomfortable about singing. No words, just all eyes on her. If we make out, we'll be home the night of the verdict." This trial began on November 28, 2006.

                                        Rod J. Rosenstein
                                        United States Attorney

                        By: _____
                                        Christopher M. Mason
                                        Special Assistant United States Attorney

                                        Jason M. Weinstein
                                        Assistant United States Attorney

I have read this statement of facts, and carefully reviewed every part of it with my attorney. I understand it, and I acknowledge that it is true and correct. I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1-9-09
Date

Kevin Wayne Gary
Kevin Gary

I am Kevin Gary's attorney. I have carefully reviewed every part of this statement of facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

1-9-04
Date

Christopher Davis, Esq.

11